## SIDNEY A. SLETTUM v. NORTHERN PUMP COMPANY AND ANOTHER.[1]

February 6, 1948.

No. 34,586.

*Nelson & Cedergren,* for relator.
*J. Frank Boyles,* for respondents.

MAGNEY, JUSTICE.

Certiorari to review an order of the industrial commission dated August 29, 1947, denying in part relator's petition for an award of compensation.

On February 9, 1942, relator then 25 years of age, was employed by respondent Northern Pump Company in its so-called jig room. In this room were stored boxes of different sizes called jigs, containing tools. While attempting to raise a box weighing between 200 and 275 pounds and push it into its place about 20 inches off the floor, he felt a sharp pain in the small of his back and dropped the box. He stayed in bed at home until February 27, except for one day. On March 18 he resumed work. He was then able to handle only the files. An assistant handled the jigs. Later he was put to

[1]Reported in 30 N. W. (2d) 708.

work on a shaper machine at the same wages and operated this machine for four or five months, or until about May 18, 1943. During that time he was suffering pain and losing weight. He informed his foreman he was going to Rochester and was told: "Don't worry, your job is here until you are fully recovered." On May 31, 1943, relator was operated on by Dr. H. H. Young at St. Mary's Hospital at Rochester. He remained there until September 4, 1943, when he returned to his home in Superior, Wisconsin. He wore a cast until March 2, 1944.

Dr. Young diagnosed relator's condition as tuberculosis and destructive arthritis of the spine, involving the fourth and fifth lumbar vertebrae, the two lowest of the vertebrae. The condition is called Pott's disease. A bone graft operation was performed on May 31, 1943, extending from the third lumbar vertebra to the sacrum. The graft, taken from the tibia, thus bridged the involved area. The disease was not cured but arrested. Dr. C. C. Chatterton describes the arresting process thus:

"* * * Tuberculosis is arrested because the tubercules are covered with calcium or bone-like material, or the tubercule is in jail and stays there until something comes along and lets him out, by injury, disease or poor health. When the tubercule is no longer kept encapsulated it gets active * * *."

Dr. Young stated that the injury which relator received was probably "an aggravating circumstance of a pre-existing condition." He said:

"He probably had the disease present in a relatively dormant state. A nonsymptomatic state. * * * But the injury caused it to become symptomatic. It was then that attention was drawn to the spine. * * * I think that aggravation produced his disability. * * * It is impossible to state whether any tuberculosis process is inactive. I would state that it is in an arrested state at the present time."

An excellent result followed the operation, with the fourth and fifth vertebrae solidly fusing. About May 1, 1944, Dr. Young cautioned

relator to do no heavy lifting, but, according to the doctor's testimony, he gave him no limitation as to pounds.

When Doctors Young and Chatterton examined him in 1945, relator stated that he had no pain. Dr. Chatterton testified: "He has no pain; he says he has his usual strength." Both doctors were of the opinion that relator had a permanent disability of 25 percent. Dr. Young saw relator about the time he returned to work. Dr. Young was asked:

"Q. Well, he talked the matter over with you and explained just what he was doing, and outside of advising him not to do any heavy lifting you felt that he could carry on?

"A. Yes.

"Q. And you feel the same today, I presume?

"A. Yes."

He was also asked:

"Q. Will he ever have full strength in the back so that he can lift anything that comes along?

"A. He may have, but I don't want him to."

Dr. Chatterton expressed the opinion that relator was strong enough to lift 100 pounds, but that he would not know about the safety factor. He did not think it advisable.

On March 9, 1944, employer wrote relator:

"Please be advised that due to circumstances beyond our control, it was necessary to remove your name from our active list of employees.

"Your prolonged illness was creating complications in our various plant records which had to be eliminated. The only solution was to follow the above procedure.

"However, when you are fully recovered and capable of resuming to your previous duties, we will be willing to re-instate you."

Before the operation, relator's foreman had given him a six months' leave of absence.

On May 2, 1944, relator leased a Standard Oil station in Superior. When he acquired the station he invested $1,056. By June 1, 1946, his total investment was $1,500. He pumps gas, changes oil, greases cars, fixes passenger tires, and does battery service, but helpers install the batteries, as he cannot lift the ordinary battery out of a car. He has handled the work himself, with occasional help, which he says is "very seldom." He limits his lifting to 20 or 25 pounds. He said: "My back is in very good shape. I have pretty good movement in it and I haven't any aches or pains. I cannot bend my lower back." Relator's net income at the filling station from May 2, 1944, to January 1, 1945, was $2,000. From January 1, 1945, to January 1, 1946, it was $3,000. He said that when he took over the Standard Oil station he felt that he could have gone back to the old job on the shaper machine at respondent's plant, which job he held four or five months and handled all right. Relator testified:

"Q. When you came back, and just before you went to work for the Standard Oil Co. you decided to try out the Standard Oil job first and if you did not see your way clear with the Standard Oil Co. you would go back on the job you had when you left?

"A. Yes. I always had the intention that I was going back to the Northern Pump Co., but this Standard Oil deal the guy was going to leave, I told him he was foolish to leave that station, because it was a pretty good spot and he was there for a number of years.

"Q. And as far as you were concerned when you took over the Standard Oil job you feel you could have gone back to the old job and handled it all right on the shaper machine?

"A. Before I could do that I would have to write to Dr. Young and get his consent as I did before.

"Q. You felt in your own mind that you could go back and handle the job on the shaper machine?

"A. Yes.

"Q. And you could have taken that job because it was a sitting down job and easy work?

"A. Yes.

"Q. But the Standard Oil job kind of appealed to you and you decided you would take that because of the future, is that right?

"A. Yes."

The referee found that relator was temporarily partially disabled from May 1, 1944, to the date of hearing, October 24, 1946. He found him temporarily totally disabled from May 16, 1943, to May 1, 1944, and also allowed reimbursement for medical and hospital expenses in the sum of $1,219.98.

The industrial commission made findings to the effect that on May 1, 1944, relator was tendered the same work as he performed prior to the date of his operation. It also found that on May 2, 1944, relator was physically able to perform the necessary labor required by the employer in the work so tendered.

Because of the injury to his back, relator has a permanent partial disability of 25 percent. The only statute applicable at the time of his injury was Mason St. 1927, 4274(c) (44), as amended by L. 1941, c. 522, which provides:

"In all other cases of permanent partial disability not above enumerated the compensation shall be 66 2/3 per cent of the difference between the wage of the workman at the time of the injury and the wage he is able to earn in his partially disabled condition, subject to a maximum of $20.00 per week. Compensation shall continue during disability, not, however, beyond 300 weeks." See, Enrico v. Oliver I. Min. Co. 199 Minn. 190, 271 N. W. 456.

The referee allowed relator compensation based on the difference between his wage at the time of the injury and the going wage of a filling station attendant. Relator contends that the commission erred in holding that on May 2, 1944, he was physically able to perform the necessary labor required by the employer in the operation of the shaper machine.

Based on the evidence as we have detailed it, it is our opinion that the industrial commission could readily find, as it did, that on May 1, 1944, relator was physically able to perform the necessary labor required by the employer in the operation of the shaper machine

which he had operated at employer's plant for four or five months prior to his going to Rochester. He himself testified that in his own mind he felt that he could go back and handle the job on the machines. Both doctors testified that he had no pain, and Dr. Chatterton said that relator told him he had his usual strength. It is apparent that relator's reason for not going back to his old job at employer's plant was not that he was unable physically to perform that work, but that the operation of the filling station gave him much better prospects economically. Relator left his toolbox at employer's plant for a year and a half after he took on the filling station before he sent for it, and stated that he had intended to go back to his job there if his filling station business proved unprofitable. Relator was an experienced machine operator. Before he went to work for respondent he had been a lathe operator for almost five years at the Duplex Manufacturing Company plant at Superior.

Relator also contends that he was not unconditionally tendered the same work that he performed prior to May 31, 1943, the date of his operation. We have set out in full the communication sent relator by his employer. In that letter, relator was told that when he had fully recovered and was capable of resuming his previous duties "we will be willing to re-instate you." Reasonably interpreted, this language imports that he was tendered the same work which he was performing when he left. The word "re-instate" means more than a mere rehiring. A fair interpretation of the word would be that relator would be given back the job he left, on the same conditions and pay. Relator insists that, since he will never fully recover, the offer of reinstatement was conditional and that he was not obliged to accept. Relator did not so interpret the offer up to the time he decided that his best interests lay in continuing the operation of the filling station. What employer and relator had in mind was that relator would get his job back when he was capable of resuming it. The finding of the commission on this phase of the case is supported by the evidence.

Since in our opinion the decision of the industrial commission is supported by the evidence, it must be affirmed.

438

Writ discharged.

MR. JUSTICE JULIUS J. OLSON took no part in the consideration or decision of this case.